1

UNITED STATES DISTRICT COURT
for the

Southern District of Indiana, Evansville, Indiana

Eugene C. Spicer, Pro Se.

-v-

U.S. Department of Education

*Defendant(s)*

Case No. 3:25-cv-261-MBP-CSW

*(to be filled in by the Clerk's Office)*

**FILED**
**11/29/2025**
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

**COMPLAINT FOR A CIVIL CASE**

**Demand for Jury Trial**   X  Yes   ☐ No

**I. Basis for Jurisdiction: Federal Question and Diversity of Citizenship**

1. Jurisdiction is appropriate under 28 U.S.C. § 1331, as this is a case that arises under the United States Constitution, federal laws, and federal common laws involving a federal question case. Additionally, diversity of citizenship exists under 28 U.S.C. § 1332, as this is a case in which a citizen of one State sues the United States government and the amount at stake is more than $75,000 as the loan balance exceeds $100,000.

2. The Plaintiff, Eugene C. Spicer, is a resident of Indiana and US citizen. The Defendant, Department of Education (DOE), is the Federal Government, with principal office in Washington, District of Columbia. The Department does business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

3. The Plaintiff has given notice under the Federal Tort Claims Act (FTCA), in written notice of claim to the Department of Education alleging injury (28 USC § 1346(b)). The Department has acknowledged receipt of notice. A sum certain was requested, more than 6 months has passed, and there has been no formal written denial by the Defendant after this notice.

4. The specific federal statutes involved include Higher Education Act of 1965 (HEA) with Violation of Public Service Loan Forgiveness Program (PSLF) (20 U.S. Code Chapter 28; 34 CFR § 685.219; 20 U.S.C. § 1087 et seq; 34 CFR Part 685). Additionally, Civil Action for Deprivation of Rights (42 U.S. Code § 1983); Fair Debt Collection Practices Act (FDCPA) (15 U.S.C. § 1692-1692p); Consumer Financial Protection Bureau (CFPB) Regulations (12 CFR Part 1026); Administrative Procedure Act (APA) (5 U.S.C. §§ 551–559); and Truth in Lending Act (TILA) (15 U.S. Code § 1601). Claim for breach of contract and unjust enrichment.

## II. The Parties to This Complaint

### A. The Plaintiff:

Eugene C. Spicer
3319 Lincoln Ave.
Evansville, IN 47714
812-430-9165
gcspicer43@gmail.com

### B. The Defendants:

Department of Education (DOE),

400 Maryland Avenue, SW

Washington, D.C. 20202

## III. ATTACHED EXHIBIT LIST

Exhibit 1: Rehabilitation Loan Agreement

## IV. FACTUAL ALLEGATIONS

5. The Plaintiff is a resident of Indiana. Uncountable efforts were made to resolve this student loan issue prior to this action. The Plaintiff had a Federal Family Education Loan (FFEL) prior to 2024 consolidation.

6. Prior to 2009, the Plaintiff was primarily self-employed. Within about a year after securing regular employment in 2009, in a qualifying public service position, the Plaintiff has made regular student loan payments.

7. Prior to 2010, the Plaintiff had the maximum allowable deferments and a student loan that was in default. In 2010, the Plaintiff made a good-faith effort to resolve default student loan status and started making payments on the loan.

8. In the Spring of 2010, the Plaintiff completed and submitted a detailed form to the DOE outlining all expenses down to costs of school lunches (Statement of Financial Status). The Plaintiff had a family of 4 and earned $44,000 a year. The Plaintiff and Defendant agreed to a payment plan of $100 per month. At that time, the Plaintiff was advised by Defendant employee, Rita, that the loans were no longer in default. The Plaintiff began making payments in March 2010.

9. In late winter 2010/spring 2011, the Plaintiff traveled for work-related training. Submitted travel expense reimbursement requests were offset in the amount of $3898. The Plaintiff requested correction of the offset and was successful.

10. The Plaintiff's federal tax refund was offset in April 2011. The Plaintiff was surprised he received offsets for travel and again from tax returns. The Plaintiff, believing to be in the loan rehabilitation program, questioned the offset. In response, the Plaintiff received a June 2011, from Federal Student Aid (FSA) which stated:

    a. "Your account will be removed from the offset process when this debt is satisfied or rehabilitated."
    b. "…you must make nine full payments of an agreed upon amount within 20 days of the due date over a 10 month period…As of November 8, 2010, you had made the required number of monthly payments towards rehabilitation."

Additionally, this same FSA letter stated that FSA did not have a signed rehabilitation agreement. As a result, the Plaintiff signed a Rehabilitation Agreement in June 2011 and submitted it to the Defendant. The Plaintiff believed this would prevent further offsets, continue to keep the loan in good standing, avoid wage garnishments, and prevent further work embarrassment (Exhibit 1). As a result, all offsets ended as stated in the agreement.

11. The June 2011 letter states that the Plaintiff had made the required number of monthly payments towards rehabilitation, but despite those payments, there were offsets of travel expenses and federal tax returns before 2011, because there was no rehabilitation agreement signed at that time. The Plaintiff signed the agreement and continued to pay the same payments with no further offsets. The Defendant's June 2011 letter is clear that "Your account will be removed from the offset process when this debt is satisfied or rehabilitated."

The Defendant has not explained the contradiction in their allegations that no agreement was signed but no other offsets, per the contract, were taken since June 2011.

12. After the Plaintiff provided the DOE a decade of copies of cancelled checks showing loan payment, DOE provided a payment spreadsheet to the Plaintiff that shows no other offsets after June 2011. After the agreement was signed, the Plaintiff had no offsets from federal tax refunds of $1053 in 2015, $677 in 2016, $1500 in 2022, and $1696 in 2023. There were no state tax offsets or garnishment from the Plaintiff's income.

13. The Defendant's allegation of ongoing default is in direct conflict with its lack of actions or offsets after the agreement was signed. A reasonable person would conclude the Plaintiff is not in default since the rehabilitation agreement, as the Defendant states: "Your account will be removed from the offset process when this debt is satisfied or rehabilitated." The debt has not been paid off/satisfied so rehabilitation must be the reason for no further offsets. In addition to no further federal tax offsets or work expense offsets, the student loan default was removed from the Plaintiff's credit reports.

14. The Plaintiff notes he received bill stubs in order to make payments beginning with the June 2010 payment. The Plaintiff believes that a stub payment was not sent and the Plaintiff missed a payment in October 2011, and the Plaintiff sent two payments in November, 2011. The bill stubs continued to show a past due amount. The Plaintiff wrote FSA regarding the past due balance. The Plaintiff received a letter dated March 20, 2012, which explained the past due balance and confirmed that the payments questioned during that time frame were "toward rehabilitation", thereby confirming Plaintiff was in loan rehabilitation and not default. FSA did not mention that there was no rehabilitation agreement. A reasonable person would believe the loan was not in default and in rehabilitation. Subsequently, the Defendant, through a DOE employee, Apryl Washington, an expert program analyst of the Default Resolution Group, concurred in 2024 that a reasonable person would believe that the loan was no longer in default per this 2012 letter.

15. The Plaintiff continued to pay with bill stubs through July 2012. In August 2012 no bill stub was received and a payment was missed. In September 2012, the Plaintiff sent two payments to the Defendant and included a note stating, "We did not get a payment coupon for August or September. The enclosed two hundred is for those months". The Plaintiff enclosed similar language with the October 2012 payment. The Plaintiff did not receive any return correspondence about the missing bill stubs and the loan payment checks were deposited.

16. From January 2013 to August 2013, the Plaintiff again received payment stubs. When no bill stub was received in September 2013, the Plaintiff sent payment with a note indicating no bill stub was received. Again, the Defendant did not return correspondence

17. From September 2013 to December 2015, the Plaintiff sent a note with each monthly payment and included a note referencing the payment consistent with the income driven

repayment plan and rehabilitation stating that no payment coupon was received, the month the payment was for, the account number, and a copy of a previous payment stub. The Defendant did not return correspondence.

18. Consistent with no default evidence, the Plaintiff notes that in 2015, he refinanced a home which included a detailed credit analysis and no default was indicated on the Plaintiff's credit report or by the bank. The Defendant's Federal Student Aid (FSA) website in 2024 indicated "You can avoid offset by entering into a repayment agreement, making your first payment during the 65-day period, and making your payments each month after that. If you are successful, then your tax refund and other federal payments will not be offset, or the amount being offset may be reduced. If you are unsuccessful, then your tax refund and other federal payments will be offset. If you enter repayment after default and again allow the loan to default, the credit bureau may continue to report the default information for up to seven years from the date the loan enters default the second time." The Plaintiff was successful in payment and did not incur any of these events after signing up for rehabilitation.

19. From January 2016 through the Covid pause in payments, the Plaintiff's enclosed a note and continued to state which month the payment was for and enclosed a copy of a previous payment stub. At no time, from September 2013 to the Covid pause in 2020, did the Defendant address the Plaintiff's enclosed payment notes or report a default.

20. From 2013 to 2020 there was no communication from the Defendant other than the loan payments were deposited. In contrast, the Plaintiff was diligent about making timely payments and providing monthly communication.

21. Thereafter, the Plaintiff made regular payments until the pandemic in 2020. Over $19,000 has been paid until the pause due to the Pandemic. More than half of the original loan amount has been paid. All of Plaintiff's payments from 2010 through the Covid pause, plus the payments following the Covid pause, were deposited by the Defendant without the Plaintiff receiving any notice of default or any other indication of any problem.

22. The Plaintiff stopped payments during the Covid payment pause. The Plaintiff resumed payments when the Covid pause ended September 2023 and made payments until May 2024 when the Plaintiff was required to consolidate (see below) and AidVantage became the Plaintiff's loan servicer.

23. The Plaintiff's payments from September 2023 to May 2024 included a letter which clearly stated "The enclosed check is for the (month, year) payment per agreement". The checks were deposited by the Defendant. The Plaintiff made timely payments for well over ten years with the goal to keep the Plaintiff out of default, offsets, collections, etc.

24. The Plaintiff's submitted a request for Freedom of Information, dated September 11, 2024, with the DOE stating expected response time of approximately 47 days. The Freedom of

Information Request No. 24-00492-PA, was submitted September 11, 2024, with July 23, 2025, response, 315 days.

25. The DOE responded on July 23. 2025, indicating that they have no records indicating that Plaintiff was notified of default since the rehabilitation agreement was signed. In fact, the DOE submitted the 2012 letter referencing the Plaintiff was in rehabilitation. The DOE also produced payment coupons indicating that if the agreed $100 was not paid, that the loan would be placed in default and reported to credit reporting companies. The assumption must then be no default status based on DOE own records. Nothing was produced in the Freedom of Information Request showing default or double default. Thus, the Defendant admits that there is no notice of default since the rehabilitation agreement was submitted.

26. On October 6, 2021, the Department of Education announced a Temporary Public Service Loan Forgiveness (TPSLF) program to allow a borrower to receive credit for past periods of repayment that previously would not qualify, such as the FFEL loans held by the Plaintiff.

27. Subsequently the Plaintiff applied for Public Service Loan Forgiveness (PSLF) through the TPSLF program. The Plaintiff was met and exceeded eligible for PSLF by years of employment and number of payments made, but was denied PSLF because of a requirement that the Plaintiff's FFEL loans must first be consolidated into a Direct Consolidation Loan. Most importantly, PSLF was denied as the loan was erroneously listed in default. This was the first time the Plaintiff was aware there was a default status classification.

28. The Plaintiff inquired of the loan consolidation process, but delayed due to efforts to correct the reported default status. During efforts to correct the default status, the Defendant repeatedly asked for patience even as the TSPLF application deadline approached.

29. As discussed above, there were two late payments when a stub was not received but no missed payments by the Plaintiff in over ten years. The Plaintiff received no communication from the Department of Education that the loan was no longer in rehabilitation or that it had been transferred to default. There were no additional federal tax offsets, negative credit reports, requests for updated income, threats of wage garnishments, or any other evidence indicating default status. There were no confirmations of payments received. The Defendant's own spread sheet of payments shows no offsets since the June 2011 agreement.

30. Public knowledge shows the DOE is not fulfilling its legal obligations of default notifications. According to *https://www.consumerfinance.gov/ask-cfpb/what-happens-if-i-default-on-a-federal-student-loan-en-663/*: (bold applied by Plaintiff). Default is the failure to repay a loan according to the terms agreed to in the promissory note. For most federal student loans, you will default if you have not made a payment in more than 270 days. If you haven't made a payment on your federal student loan for 270 days (nine months), and you have not made arrangements with your lender or servicer that do not obligate you to make those payments (like deferment or forbearance), you are probably in default. **During the**

**months in which you have failed to make payments on your federal student loans, your servicer must exercise "due diligence" in attempting to collect the loan - your servicer must make repeated efforts to locate and contact you about repayment.** If you have not received a letter from your servicer and you believe you may be in default, contact your servicer immediately. Ask about repayment options and find out if it is possible for you to avoid default. Once your federal student loan goes into default, you could face a number of consequences:

> Your wages may be garnished without a court order
>
> You can lose out on your tax refund or Social Security check (funds would be applied toward your defaulted student loan)
>
> Credit reporting agencies will be notified, and your credit score may suffer.

31. Plaintiff clearly had an agreement and corresponded monthly with the Defendant. The Defendant did not exercise any form of "due diligence". The Plaintiff has been employed in the same position since 2009, and has resided in the same address for approximately 25 years. None of the listed consequences were experienced by the Plaintiff. The Plaintiff was not notified that the loan was being placed back in default nor have any reason to suspect that it was.

32. Additionally, the FSA website says "Federal law related to the collection of debts owed to the government requires DOE to request that the U.S. Department of the Treasury withhold money from your federal or state income tax refunds, Social Security payments (including Social Security disability benefits), and other federal payments to be applied toward repayment of your defaulted federal student loan. This withholding is called Treasury offset. Your state tax refunds may also be withheld and applied toward repayment of your loan. Before the offset begins, a notice of intent to offset will be sent to your last-known address to inform you that the offset is scheduled to begin in 65 days." Again, since the rehabilitation agreement was signed, that precludes offsets, there were no offsets based on the own records of the Department. All offsets stopped after the June 2011 rehabilitation agreement with no notice of changes.

33. The Defendant is the U.S. Department of Education, an agency of the federal government that establishes policy for, administers, and coordinates most federal assistance to education. It established policies on federal financial aid for education and distributing as well as monitoring those funds. At the time of Fresh Start program in about 2022, the DOE web page indicated that " Normally, one of the main ways to get out of loan default is by rehabilitating your loans. But right now, loan rehabilitation has been replaced by the temporary Fresh Start program. After Fresh Start ends, loan rehabilitation will be an option again." As discussed above, the Plaintiff participated in rehabilitation plan since 2011.

34. The Defendant offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make monthly repayment of these loans more affordable. Numerous reports described the Defendant's historical failures in running the student loan programs

35. It is public knowledge of the DOE failures regarding student loans. NPR investigation notes offer striking evidence plans have been badly mismanaged by loan servicers and the U.S. Department of Education. Borrowers' information is transferred via what's known as an EA27 file, and every time a file is transferred, data and context can be lost, and mistakes made. In fact, earlier versions of the EA27 didn't even include payment counts for certain IDR plans. Some records lacked basic information, like when a borrower changed repayment plans or how much the correct payment amount was. From 1992 to 2009, ACS Education Services managed the entire federal student loan portfolio. But when the federal government ended its contract with ACS and the company began transferring borrowers' profiles to other servicers, it became clear that ACS had made a dizzying number of errors-more than 5 million according to a 2020 report. (https://www.npr.org/2022/04/01/1089750113/student-loan-debt-investigation).  The program was mismanaged for years until recently, when former President Joe Biden reformed it (https://www.usatoday.com/story/news/politics/2025/10/30/public-service-loan-forgiveness-changes-trump/86982943007/)

36. Both sides of the aisles admit the Department of Education has failed. That the Department could have avoided this mess if [it] had done its job," says Rep. Virginia Foxx, the top Republican on the House education committee. Rep. Bobby Scott, the top Democrat on the House education committee. "This is worse than we expected." And ,"If you've made qualifying payments, you need to get credit for them," Scott says. "And if the Department of Education has lost records, then the presumption or the burden of producing the records ought to be on the Department of Education."  This loss of past payment credit happens not because those payments no longer count-but because the technology is deeply flawed. Documents show, when borrowers return to good standing, they also lose any record of qualifying IDR payments made prior to default. (https://www.npr.org/2022/04/01/1089750113/student-loan-debt-investigation).

37. The Defendant admits that it has failed significantly at managing the student loan duties and significantly harmed borrows. In the NPR article, Education Department spokesperson said, "Borrowers place their trust in us to make sure these plans work the way they were intended to, and we intend to honor that trust. We are aware of historical issues with prior processes that had undermined accurate tracking of eligible payments. The current situation is unacceptable and we are committed to addressing those issues." (https://www.npr.org/2022/04/01/1089750113/student-loan-debt-investigation).

38. Additionally, in an April 19, 2022, press release states: "Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs. Notes public service loan and income-driven repayment (IDR) forgiveness by addressing historical

Case 3:25-cv-00261-MPB-CSW    Document 1    Filed 11/29/25    Page 9 of 19 PageID #: 9

9

failures in the administration of the federal student loan programs." The release adds "immediate corrective actions announced today that will provide relief to borrowers harmed in the past". Further, the Defendants admits review of Federal Student Aid (FSA) and its servicers to accurately tracking progress toward relief review revealed significant flaws. Additionally, the record keeping was so poor that FSA will count months spent in deferment prior to 2013 toward income driven repayment as its data cannot distinguish IDR-eligible deferments from other deferments. (https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs)

39. Thus, it is public knowledge of the failures of both the FSA, Department of Education, as well as its selected loan servicers. See: (https://www.aft.org/press-release/embattled-student-loan-servicing-giant-mohela-hit-groundbreaking-consumer-protection); and (https://www.consumerfinance.gov/about-us/newsroom/cfpb-bans-navient-from-federal-student-loan-servicing-and-orders-the-company-to-pay-120-million-for-wide-ranging-student-lending-failures/) (Student-loan borrowers are getting $100 million in payments after being 'cheated' out of lower bills by a major lender, a federal consumer watchdog says. (https://finance.yahoo.com/news/widely-criticized-student-loan-servicer-mohela-faces-investigation-by-multiple-state-attorneys-general-100000033.html

40. As a result of the Defendant's admitted failures, the Defendant indicated that it planned to " To fully address past issues with IDR payment counting, FSA will do a one-time revision of IDR-qualifying payments for all Direct Student Loans and federally managed Federal Family Education Loan Program (FFEL) loans. Any months in which borrowers made payments will count toward IDR, regardless of repayment plan. Payments made prior to consolidation on consolidated loans will also count. This fix is necessary to correct for data problems and past implementation inaccuracies. Any borrower who has made the required number of payments for IDR forgiveness based on this payment-count revision will receive loan cancellation automatically. Additionally, FSA will count months spent in deferment prior to 2013 toward IDR forgiveness."

41. The Defendant has admitted it made significant failures in managing student loans. However, the Defendant has compounded and continued its admitted longstanding failures in the Student Loan Programs involving the new federal student loan programs. The Defendant is now harming borrowers in implementing its "immediate corrective actions" relying on "significant flaws" and "record keeping so poor that FSA could not keep track of what it had done." The Plaintiff is the new victim of this poor record keeping. Its outside agents are so poor, the Defendant took over all PSLF procession in July 2024 in efforts to overhaul loan servicing and implement significant improvements (https://www.ed.gov/news/press-releases/biden-harris-administration-approves-additional-12-billion-student-debt-relief-35000-public-service-workers).

42. The Plaintiff paid as agreed and should be entitled to loan forgiveness under PSLF but was denied due to the Defendant's poor management, poor record keeping, and lack of contact

with the Plaintiff as required by law if a debt was truly in default since 2011. Credits for forbearance, payments, and forgiveness have been erroneously denied.

43. The Defendant indicates it does not have possession of the agreement which is understandable given its admitted history of failures and poor record-keeping. However, the Defendant has failed to take account for the diligence and good faith efforts made by the Plaintiff in complying with obligations of the program since about 2010.

44. As a result of this incorrect default status, the Plaintiff loses all years of credit for payment and the PSLF requirement of 10 years of payments (120 monthly payment period) must start over.

45. As a result of the incorrect default status, the money paid by the Plaintiff is effectively thrown away. The balance of the loan has increased due to reduced agreed payment amount and over ten years of accruing interest. A reasonable person would recognize that the Plaintiff made the payments as a result of the agreement. It would be irrational for the Plaintiff to make monthly payments to a loan balance that was in default and was also not decreasing loan balance.

46. This result is a catastrophic financial injury and violation of law. The Plaintiff has disputed this default allegation vigorously with no avail from the Defendant.

47. The Defendant's records are so poor that after the Plaintiff learned of the incorrect default status, the Plaintiff was initially advised that there was no evidence of any payments from about 2010 until 2020. The Plaintiff was then told there were no payments made since 2017. The Plaintiff made copies of each monthly check from 2010 through 2022 and forwarded to the Defendant. After the Defendant received the canceled checks, Plaintiff then received the spreadsheet confirming payments consistent with this complaint and no offsets since the rehabilitation agreement. Clearly, the Defendant's records are not accurate in tracking payments and default status.

48. The Plaintiff has followed all directions by the Defendant in order to resolve this incorrect default status. The Plaintiff has written enumerable amounts of letters to FSA, made countless phone calls, and has complained to the Default Resolution Group and Ombudsman repeatedly with no result.

49. Additionally, the Plaintiff has contacted consumer protection agencies, the Better Business Bureau, Inspector General, several congressmen, senators, the President, Vice President, and Commissioner of the Department of Education. As of this date, the Defendant has not provided any information of default status and says that it remains under investigation.

50. As a result of a Congressional Inquiry, in January 2024, the Plaintiff was given a contact name at the Ombudsman Group that appeared to have some authority to address the situation.

On January 18, 2024, the same representative initially indicated that a reasonable person would believe that Plaintiff was in rehabilitation per the March 2012 letter.

51. Also on January 18, 2024, after the Plaintiff requested all documents related to the case, and mentioned that he had filed a Tort Claim notice, a director called the Plaintiff, even providing his cell phone, and advised the Plaintiff that an equitable solution or positive outcome, or words to that that effect, would be forthcoming and that a review would take approximately two weeks.

52. The deadline for application to the TPSLF program was April 30, 2024. The Plaintiff made multiple requests to the Ombudsman Group contact and was asked for patience even after expressing the incredible financial and personal stress the situation was causing. The communications continued as the matter is still under investigation.

53. After waiting nearly four months, and following another Congressional Inquiry, the Ombudsman responded and refused to correct the default classification but again indicated it is still under review.

54. The Ombudsman disregarded: The Defendant's very public admissions of extremely poor record keeping during the time period covered by the Plaintiff's loan rehabilitation; the decade-long of lack of communication from the Department of Education versus the Plaintiff monthly communication with the Department of Education in the form of loan payment and attached loan payment correspondence letter, thereby providing the Department over 120 prompts/opportunities to address any loan issues in clear violation of numerous consumer statute and the administrative law responsibilities.

55. The DOE has showed complete absence of due diligence to communicate a change in loan status, particularly a change that is as consequential as default, to the Plaintiff. Comparatively, the Plaintiff has maintained from original rehabilitation to present, and made timely monthly payments according to the terms of the contract for well over a decade.

56. The Plaintiff followed-up with the Director who had initially stated that an equitable solution would be forthcoming and was told to not contact that person as he was no longer in that role.

57. Despite going up the ladder and all of the actions above, from January 2024 through April 2024, the Plaintiff was again advised to "be patient" regarding this life altering financial tragedy and injustice. The matter was again reported "as still under investigation".

58. Within one month of the consolidation of the TPSLF deadline, on April 2, 2024, the Plaintiff had no choice but to consolidate loans given the Defendants recalcitrance, in order to have any opportunity at partial PSLF, and minor mitigation of significant financial injuries. The consolidation would at least allow for two years of forgiveness during the pandemic and

hopefully for periods of forbearance. The Plaintiff continued to make payments as agreed during the review and the loan payments were deposited. The Plaintiff of course applied for Public Service Loan Forgiveness (again), and the Save Plan.

59. On April 2, 2024, when the loans were consolidated, and the Plaintiff enrolled in SAVE and re-enrolled in PSLF, the loan was transferred to AidVantage. The Plaintiff received communication that the consolidation process would take a few weeks and there was nothing to be done.

60. From April 2024 through August 2024, Ed Financial, one of the Defendant's loan servicers, began to harass the Plaintiff for amounts of funds that were inconsistent with the income-based derived amount from the application process. The Plaintiff was advised that the monthly payment was $200 per month, then $800 per month, then zero dollars per month, and back to $800 per month, despite a period of pause due to legal issues of the Save Plan. Remarkable, the different requested payment amounts even occurred on the same day. Repeated letters to EdFinancial explaining that the loans were consolidated on April 2, 2024, were unsuccessful at stopping the threatening letters/email.

61. Also during that time, the Plaintiff contacted Federal Student Aid (FSA) about the threats from EdFinancial. FSA advised the Plaintiff that EdFinancial was our servicer. However, when we asked how we could have both AidVantage and EdFinancial as our servicer at the same time we did not receive a response.

62. Also included in the April 2024 letter to the Plaintiff from AidVantage, was the statement, "If you're consolidating defaulted loans, you were notified earlier that you're required to repay your new consolidation loan under an Income Driven Repayment plan." Again, the Plaintiff continued to making payments to the DOE through May 2024 despite a letter from AidVantage dated on April 13, 2024, noting that they had received the consolidated application which stated, "There's nothing you need to do right now".

63. Subsequently, AidVantage, in August 2024 advised the Plaintiff that no payments were due, the loans have been consolidated. The letter further stated that loans coming out of default were required to be in an income driven payment plan.

64. The Plaintiff followed-up the August 2024 letter from AidVantage for confirmation. AidVantage confirmed that the Plaintiff was enrolled in the SAVE program and that the Plaintiff was in forbearance due to recent lawsuits. At the same time, in August 2024, Ed Financial threatened to report the Plaintiff to credit reporting agencies if payment was not made despite a pause on credit reporting or collections until September 2024. The Plaintiff was given instructions by Ed Financial of how to dispute negative credit report. This conflicts with information from AidVantage that no payments were due. This also conflicts with the Department of Education's payment "on-ramp" where no credit reporting was to occur until the end of September 2024. FSA again could not explain why the Plaintiff has

two loan servicers. The acts of the DOE have led to violations of the Fair Debt Practices Act due to varying loan amount, false information, and threats of negative credit reporting that is precluded by law.

65. In September 2024, the Plaintiff received a letter from Mohela, that the monthly student loan payment is over $840 per month. The Plaintiff called Mohela. Mohela advised the Plaintiff that he was not in the Save Plan, was not in forbearance or eligible for public service loan forgiveness, and had to reapply for both SAVE and PSLF programs. This is in direct conflict with communications from AidVantage indicating that consolidation loans had to be based on income driven plans. Mohela placed the Plaintiff in a regular payment plan. The incorrect debt due is now listed on the Plaintiff's credit report. This amount of debt is inconsistent with information of about $300 per month estimated at consolidation. These actions harmed the Plaintiff in forbearance, interest, and Save Plan enrollment and benefits. The Defendant's actions are the proximate cause of violations of numerous laws and the level of incompetence in managing the student loan system is truly staggering. Most importantly, the actions of the DOE have prevented public service loan forgiveness.

66. The Plaintiff called FSA and was advised that everything Mohela said was wrong. Amazingly, FSA advised the Plaintiff to return to the Ombudsman and Default Resolution Group, which was done, and no response has been received other than the matter is noted in file.

67. In September 2024 the Plaintiff received a refund check from the Defendant in the amount of $100 that was paid in November 2023. There was no explanation. When the Plaintiff inquired to FSA, the advice received was to contact our loan servicer despite the check being paid by the Department of Education. The refund was via the Treasury Department.

68. More recently, when the Plaintiff tried to sign up for an income driven plan online, the system said the Plaintiff must consolidate despite having already consolidated. The DOE suggested I withdraw from the Save plan and do a paper application for income based plan without knowing the amount of payment due. On more than a weekly basis the Plaintiff has requested online access to submit an application in order to know the payment amount before signing up. There has been no correction of the online access. The paper application takes months to process and the payment amount is unknown. Every month the plaintiff is now charged 9% interest or $1000 due to this failure of the DOE. This is punitive and violates truth in lending. It is public knowledge there is approximately 1.3 million backlog of income driven applications pending with significant delays in processing.

69. The Plaintiff had to do a work around online, per instructions of FSA, to sign up for a payment plan with an unknown amount of monthly payment due.

70. A September 2025 demand email letter to the DOE was returned as undeliverable. The Plaintiff's contact at the DOE, who is investigating the wrongful default, appears to no longer

be employed at the DOE as the email comes back as undeliverable. As a result the above disturbing events, the claimant has filed this action seeking correction of default status and public service loan forgiveness and other relief.

## V. CLAIMS

71. **COUNT I: BREACH OF CONTRACT (Rehabilitation Agreement)** Claim for damages for breach of contract for failure of the Defendant to fulfill their contractual obligations and legal duties under law. Plaintiff entered into a valid and enforceable contract (the rehabilitation agreement) with the Defendant in June 2011. Plaintiff fully performed his obligations under this contract. Defendant breached this contract by erroneously classifying Plaintiff's loan as in default, failing to acknowledge and apply the benefits of the rehabilitation agreement, and failing to maintain accurate records. As a direct result of this breach, Plaintiff has suffered significant damages. As a direct result of this breach, Plaintiff has suffered significant damages, including the loss of PSLF eligibility and administrative burdens.

72. **COUNT II: BREACH OF CONTRACT (Rehabilitation Agreement).** Alternatively, PROMISSORY ESTOPPEL/EQUITABLE ESTOPPEL the Defendant, through its words and actions (including the March 2012 letter and acceptance of payments for over a decade), made clear representations that Plaintiff's loan was rehabilitated and not in default. Plaintiff reasonably and detrimentally relied on these representations by continuing to make payments. Defendant's subsequent assertion of default constitutes affirmative misconduct and would result in an unconscionable injury to Plaintiff's loss of PSLF eligibility and administrative and financial burdens.

73. .**COUNT III: UNJUST ENRICHMENT** Plaintiff conferred a substantial benefit upon the Defendant through over a decade of consistent loan payments, made in the good-faith belief that his loan was rehabilitated. It would be inequitable and unjust for the Defendant to classify Plaintiff's loan as in default and deny him PSLF eligibility, particularly given the Defendant's admitted systemic failures while recovering approximately $20,000.

74. **COUNT IV: CIVIL ACTION FOR DEPRIVATION OF RIGHTS (42 U.S.C. § 1983).** The Defendants, acting under color of federal law, have deprived Plaintiff of established statutory rights under the Higher Education Act and his property interests in the form of income and benefits, without due process.

75. **COUNT V: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA).** Defendant through selection and use of incompetent agents have engaged in debt collection practices that violate the FDCPA, 15 U.S.C. § 1692e and § 1692f, by misrepresenting the legal status of the debt and using false or misleading representations resulting in ongoing cascading harms. The Defendant and by and through its agents have engaged in abusive, deceptive, or unfair practices.

76. **COUNT VI: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA).** Defendant's actions, including the arbitrary and capricious classification of Plaintiff's loan as in default despite evidence of rehabilitation, the agency's own documentary admissions, and the agency's own admitted systemic failures, constitute agency action reviewable under the APA, 5 U.S.C. §§ 701-706. The Defendant's actions are arbitrary, capricious, or not in accordance with the law.

77. **COUNT VII:** Claim for damages for violations of the Truth in Lending Act (TILA). The Defendant has failed to provide clear disclosure of loan terms and failed to follow the law and due diligence.

78. **COUNT VIII: VIOLATION OF THE HIGHER EDUCATION ACT (HEA) OF 1965.** The HEA requires the Department of Education to ensure the proper administration of student loan programs. Plaintiff was engaged in a loan rehabilitation program, which, once successfully completed, should have removed the loan from default status and made him eligible for PSLF. Defendant failed to accurately track Plaintiff's payments and his loan's status, wrongfully classifying the loan as being in default, failed due diligence, all in direct violation of the HEA and its regulations. As a direct and proximate result of Defendants' violations of the HEA, Plaintiff has been deprived of the benefits of PSLF and has suffered financial harm.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eugene C. Spicer respectfully requests that this Honorable Court enter judgment against the Defendants and grant the following relief:

Declare that the Plaintiff's student loan was rehabilitated in June 2011, is not in default, and that Plaintiff has been in good standing with respect to his loan obligations since that date.

Order the Defendant to immediately credit Plaintiff for all qualifying payments made since June 2011 towards Public Service Loan Forgiveness (PSLF) and other federal loan benefits, including credit for periods of forbearance and grant PSLF approval of $104,000 current loan amount. Reimburse overpayment amounts with interest after discharge requirements were met.

Order the Defendant to immediately inform all its loan servicing agents that the debt is no longer valid and remove debt from Plaintiff's credit reports.

Award compensatory damages to Plaintiff for all financial losses, time, efforts, and the like incurred as a result of Defendant's actions, and reimburse plaintiff for any other pecuniary losses.

The Plaintiff has consulted with attorneys and to recover these associated costs. In the event the Plaintiff secures outside counsel for trial, to award of reasonable attorney fees, cost of this action, and all other costs as permitted by law.

Grant any and all other just and appropriate relief as the Court deems fit.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**DATED:** November 29, 2025.

Respectfully submitted,

Eugene C. Spicer (Pro Se)

_____*Eugene C. Spicer*_____ November 29, 2025.

3319 Lincoln Ave.

Evansville, Indiana 47714

812 430 9165

gcspicer43@gmail.com

# Exhibit 1: Rehabilitation Loan Agreement

Case 3:25-cv-00261-MPB-CSW  Document 1  Filed 11/29/25  Page 17 of 19 PageID #: 17



FAX 903-454-2243

## U. S. DEPARTMENT OF EDUCATION
## STUDENT FINANCIAL ASSISTANCE

D021731497

020124  0939  003645
EUGENE C SPICER
3519 LINCOLN AVE
EVANSVILLE IN  47714-0145

DATE: JUNE 18, 2011

### REPAYMENT AGREEMENT UNDER THE LOAN REHABILITATION PROGRAM

THIS LETTER CONFIRMS MY ACCEPTANCE INTO THE LOAN REHABILITATION PROGRAM AND MY AGREEMENT TO REPAYMENT OF MY DEFAULTED FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM  STUDENT LOAN(S) HELD BY THE U.S. DEPARTMENT OF EDUCATION (DEPARTMENT).  I UNDERSTAND THAT COMPLIANCE WITH THIS AGREEMENT IS A PREREQUISITE TO THE SALE OF MY LOANS TO THE AUTHORIZED, DEPARTMENT-APPROVED LENDER.  PLEASE CHECK THE APPROPRIATE PARAGRAPH:

(✓) I UNDERSTAND THAT I MUST MAKE AT LEAST NINE (9) MONTHLY PAYMENTS IN THE AMOUNT OF 100.00, BEGINNING 06/19/11, WITH EACH PAYMENT DUE ON THE SAME DAY EACH MONTH THEREAFTER.  I MUST MAKE THE FULL PAYMENTS IN THE AGREED AMOUNT WITHIN TWENTY(20) DAYS OF THEIR MONTHLY DUE DATES OVER A TEN MONTH PERIOD.  IF I FAIL TO MAKE THE REQUIRED NUMBER OF ON TIME PAYMENTS IN A TEN (10) MONTH PERIOD, I WILL NEED TO BEGIN A NEW SERIES OF AGREED PAYMENTS IN ORDER TO QUALIFY FOR REHABILITATION OF MY LOAN(S).

(✓) I AM CURRENTLY MAKING MONTHLY PAYMENTS.  I UNDERSTAND THAT THESE PAYMENTS, IF TIMELY, WILL BE INCLUDED IN THE CALCULATION OF THE REQUIRED MINIMUM NUMBER OF MONTHLY PAYMENTS.  I WILL CONTINUE TO MEET MY ESTABLISHED MONTHLY PAYMENT DUE DATE.

I ALSO UNDERSTAND AND AGREE TO THE FOLLOWING TERMS AND CONDITIONS:

1. I UNDERSTAND THAT THIS AGREEMENT IS NULL AND VOID IF I DO NOT HONOR THE TERMS OF THIS AGREEMENT BY MAKING A FULL PAYMENT WITHIN TWENTY DAYS OF THE MONTHLY DUE DATE EVERY MONTH FOR A MINIMUM OF NINE CONSECUTIVE MONTHS.  SHOULD THIS OCCUR, I WILL NEED TO BEGIN A NEW SERIES OF AGREED UPON PAYMENTS IN ORDER TO QUALIFY FOR REHABILITATION OF MY LOANS.

2. I CANNOT CHANGE THE MONTHLY PAYMENT AMOUNT WITHOUT THE DEPARTMENT'S AGREEMENT OR THE AGREEMENT OF THE COLLECTION AGENCY SERVICING MY ACCOUNT.

3. I MAY HAVE TO PROVIDE A NEW FINANCIAL STATEMENT IN ORDER TO SUPPORT A REQUEST TO CHANGE MY MONTHLY REQUIRED PAYMENT AMOUNT.

4. I MUST CONTINUE TO MAKE MONTHLY PAYMENTS TO THE DEPARTMENT BEYOND THE REQUIRED MINIMUM PERIOD UNTIL I AM NOTIFIED IN WRITING BY THE DEPARTMENT OR MY NEW LENDER THAT THE SALE HAS BEEN COMPLETED AND THAT I AM TO BEGIN MAKING PAYMENTS DIRECTLY TO MY LENDER.

CONTINUED

X10    0001216    021731497    X106178009

5. ANY INTEREST THAT I OWE AT THE TIME MY LOAN (S) IS SOLD WILL BE CAPITALIZED BY THE LENDER, THAT IS, THE LENDER WILL ADD ANY UNPAID INTEREST TO THE PRINCIPAL I OWE ON THE LOAN(S) AND THIS WILL BECOME THE NEW PRINCIPAL BALANCE ON THE LOAN(S). INTEREST WILL THEN ACCRUE ON THIS NEW, HIGHER PRINCIPAL. THE DEPARTMENT AGREES TO WAIVE COLLECTION OF ANY COST THE DEPARTMENT INCURS AS A RESULT OF THE SALE OF MY LOAN(S) UNDER THIS REHABILITATION AGREEMENT UNLESS I DEFAULT ON THE LOAN(S) IN THE FUTURE AND THE DEPARTMENT TAKES ASSIGNMENT OF THE LOAN(S). THE DEPARTMENT WILL COLLECT AS PART OF THE DEBT THEN OWED, THE COLLECTION COST ORIGINALLY WAIVED UNDER THIS AGREEMENT. THIS WILL SUBSTANTIALLY INCREASE THE AMOUNT THAT WILL THEN BE OWED TO SATISFY THE DEBT TO THE DEPARTMENT.

6. AFTER THE SALE OF MY LOAN(S), ANY PAYMENTS MADE TO THE DEPARTMENT WILL BE FORWARDED TO MY LENDER FOR CREDIT TO MY ACCOUNT.

ANY INVOLUNTARY PAYMENT (TREASURY OFFSET) OR POST-DATED CHECK WILL BE REFUNDED TO ME AT THE ADDRESS ON MY BILLING STATEMENT.

7. MY NEW LENDER WILL ESTABLISH A NEW DUE DATE AND WILL CALCULATE A NEW MONTHLY PAYMENT AMOUNT BASED UPON THE BALANCE OWED AT THE TIME OF SALE. THE AMOUNT OF THE REQUIRED MONTHLY INSTALLMENT PAYMENT MAY SUBSTANTIALLY INCREASE.

I HAVE READ THE ABOVE AND AGREE TO THE TERMS AND CONDITIONS OF THE LOAN REHABILITATION PROGRAM AND THIS REPAYMENT AGREEMENT.

_____    _____
SIGNATURE - EUGENE C SPICER  DATE

PLEASE RETURN THIS REPAYMENT AGREEMENT TO:

U.S. DEPARTMENT OF EDUCATION
ATTN: REHABILITATION SALE
P.O. BOX 5609
GREENVILLE, TX 75403-5609